**Charles HARTWELL, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Crim. No. 556-68.**

United States District Court, District of Columbia.

Dec. 26, 1972.

Dennis E. Curtis, Jerome N. Frank Legal Services Organization, Yale Law School, for petitioner.

Peter R. Reilly, Asst. U. S. Atty., appeared for respondent. Harold H. Titus, Jr., U. S. Atty., Earl J. Silbert, Principal Asst. U. S. Atty., Oscar Altshuler, and Craig M. Bradley, Asst. U. S. Attys., were on the brief for respondent.

## MEMORANDUM AND ORDER

YOUNGDAHL, Senior District Judge.

On September 10, 1968, petitioner Charles E. Hartwell waived trial by jury and was subsequently found guilty by this Court of an offense in violation of 26 U.S.C. § 4704(a)[1] on one count and an offense in violation of 21 U.S.C. § 174[2] on a second count. After having determined that petitioner was an offender eligible for sentencing under Title II of NARA[3], and at his request, this Court on October 25, 1968 ordered him committed to the custody of the Attorney General for a period not to exceed thirty days[4] for an examination to determine whether he was an addict[5] and likely to be rehabilitated through treatment. Following that examination[6] by the Staff at the Federal Correctional Institution at Danbury, Connecticut, the Court sentenced petitioner to an indeterminate period not to exceed ten years under NARA.[7]

Petitioner entered Danbury on November 11, 1968 and began in the drug therapy program in force at that institution. After fourteen months of successful participation, the staff there indicated that he was ready for parole and on December 16, 1969, parole was granted. Petitioner's freedom was short lived, however, for on July 31, 1970, a warrant[8] was issued by the parole board and he was returned to Danbury. Upon returning he found that the Daytop Program[9] had been instituted replacing the program in which he had successfully participated earlier. He entered the Daytop Program and participated in it until his removal following an "incident"[10] on May 7, 1971, and has

---

1. Act of Aug. 31, 1954, ch. 1147, § 8, 68 Stat. 1004 (repealed 1970).

2. Act of July 18, 1956, ch. 629, Title I, § 105, 70 Stat. 570 (repealed 1970).

3. Narcotic Addict Rehabilitation Act of 1966, 18 U.S.C. §§ 4251–55 (Supp. V, 1965–69).

4. 18 U.S.C. § 4252 (Supp. V, 1965–69).

5. The presentence report indicated that during an examination by Dr. Belton, Staff Physician at the D.C. Jail, petitioner admitted that he had been using 25 capsules of heroin daily for the three years prior to his conviction in 1968.

6. See Appendix A for Letter from Frank F. Kenton, Warden, Federal Correctional Institution, Danbury, Connecticut, to Youngdahl, J., November 22, 1968 and Staff Evaluation attached thereto.

7. A ten year indeterminate sentence under NARA was considerably more lenient than that which the Court could have imposed. Count one (26 U.S.C. § 4704 (a)) carried a possible term of not less than two or more than ten years; count two (21 U.S.C. § 174) carried a possible term of not less than five or more than twenty years. However, the Indeterminate Sentence Act (24 D.C.Code § 203 (1967)) did not apply to count two because a 21 U.S.C. § 174 conviction was specifically exempted from the Indeterminate Sentence provisions by 26 U.S.C. § 7237 (Supp. V, 1965–69). Therefore, the Court could have imposed a minimum sentence of twenty-two years.

8. The warrant alleged the following points in violation of parole:
   a. Arrest for violation of the Uniform Narcotics Act. Petitioner had been convicted and sentenced to thirty days for possession of a small quantity of marijuana.
   b. Failure to report change of residence and employment.
   c. Failure to comply with Title II after-care treatment program. Petitioner was delinquent in his appointments with his probation officer in May and June and tested positive for quinine in September of 1970.

9. See discussion *post*.

10. The "incident" involved an altercation between petitioner and another inmate during one of the group sessions. It was petitioner's testimony that the other inmate became angry and left his seat and that petitioner kicked him in self defense. As a result, petitioner was placed in "segregation" for about seven days and became eligible to re-enter the program after an additional two weeks.

not participated in a NARA program since that time.[11]

Without successful participation in a NARA approved program, petitioner is ineligible for parole. As a result of his nonparticipation, therefore, he faces the prospect of completing the ten year sentence without an opportunity for parole.

Petitioner brings this motion pursuant to 28 U.S.C. § 2255 asking the Court to vacate his sentence, resentence him to time served, resentence him in some other manner as will render him eligible for parole without participation in the NARA Daytop Program, or grant such other relief as the Court deems proper.

*Jurisdiction under § 2255*

Preliminarily, an issue is raised by the Government's opposition to resentencing petitioner urging that this Court decline jurisdiction on the ground that petitioner's proper remedy lies in the District of Connecticut by way of writ of habeas corpus. Petitioner answers that a motion to vacate his sentence pursuant to 28 U.S.C. § 2255 is the proper remedy.

■ It is settled in this jurisdiction and elsewhere that § 2255 will lie only to attack the *imposition* of a sentence and that an attack on the *execution* thereof may be accomplished only by way of habeas corpus in the district of confinement. United States v. Wilson, 471 F.2d 1072 (D.C.Cir.1972); Mordecai v. United States, 137 U.S.App. D.C. 198, 421 F.2d 1133 (1969)[12], cert. denied, 397 U.S. 977, 90 S.Ct. 1098, 25 L. Ed.2d 272 (1970); Freeman v. United States, 103 U.S.App.D.C. 15, 254 F.2d 352 (1958); Allen v. United States, 327

F.2d 58 (5th Cir. 1964); Halprin v. United States, 295 F.2d 458 (9th Cir. 1961). "[A § 2255] motion may be maintained only if the judgment of conviction is itself subject to collateral attack. It may not be invoked for matters occurring subsequent to the judgment." United States v. Carrell, 231 F.Supp. 724 at 728 (D.D.C.1950). "If predicated on facts that existed *prior to the imposition* of sentence, a motion under section 2255 may encompass all the grounds that might be included in a habeas corpus petition." (Emphasis added). Stirone v. Markley, 345 F.2d 473 at 474 (7th Cir. 1965), cert. denied, 382 U.S. 829, 86 S.Ct. 67, 15 L.Ed.2d 73 (1965). Unlike the Great Writ, however, § 2255 is not plenary in its application.

■ As the law of habeas corpus developed, the number of applications for the writ increased greatly. Many were found to be patently without merit when compared with the records of the sentencing court.

But, since a habeas corpus action must be brought in the district of confinement, those records [were] not readily available to the habeas corpus court. . . . These practical problems [were] greatly aggravated by the fact that the few District Courts in whose territorial jurisdiction major federal penal institutions are located were required to handle an inordinate number of habeas corpus actions *far from the scene of the facts,* the homes of the witnesses and the records of the sentencing court solely because of the fortuitous concentration of federal prisoners within the district." (Emphasis added). United States v. Hayman, 342 U.S. 205 at 213–214, 72 S.Ct. 263, 269, 96 L.Ed. 232 (1952).

---

11. Although petitioner has been offered several additional opportunities to re-enter the Daytop Program, he has consistently rejected the offers and indicated at the hearing that he would not enter the Daytop Program even without the objectionable features such as the "haircuts".

12. § 2255 "refers only to the sentence as *imposed,* as distinct from the sentence as

it is being *executed.* If appellant's sentence is being executed in a manner contrary to law . . . he may seek habeas corpus in the district of his confinement. Section 2255 is not broad enough to reach matters dealing with the execution of sentence." Mordecai v. United States, 137 U.S.App.D.C. 198, 421 F.2d 1133 at 1140 (1969), citing *Freeman.*

In an effort to alleviate some of the congestion and distribute the caseload more evenly among the districts, a "jurisdictional" bill was enacted which "established a procedure whereby a federal prisoner might collaterally attack his *conviction* in the sentencing court." (Emphasis added). *Id.* at 215, 72 S.Ct. at 270. That bill became the present day § 2255 and provides a remedy in the nature of the ancient writ of error *coram nobis* although broader in scope, the purpose being "to hold any required hearing in the sentencing court because of the inconvenience of transporting court officials and other necessary witnesses to the district of confinement." *Id.* at 220–221, 72 S.Ct. at 273.

The Court is thus faced with a two-pronged inquiry: Does the present motion attack the *imposition* of the sentence complained of, and is the sentencing court the most convenient forum in which to litigate the present complaint? Petitioner need not show that both answers are affirmative. The Court holds, however, that he has not shown that either is the case.

■ Petitioner does not allege an infirmity in his conviction or in the original sentencing procedure. (Petitioner's Memorandum, p. 2, filed Oct. 11, 1972). Instead he argues that the original sentencing has been invalidated by subsequent events. Close consideration of this contention reveals that all of petitioner's contentions relate to the *manner of execution* of his sentence, concededly valid when imposed. Petitioner first contends that "the government [*sic*] unlawfully required petitioner to participate in the Daytop program as a prerequisite for parole eligibility after he returned to Danbury as a parole violator in October, 1970." (Petitioner's Memorandum, p. 1, filed Dec. 7, 1972). It is alleged that the NARA Staff deprived petitioner of an opportunity to volunteer for Daytop and that the NARA Staff never conducted a diagnostic study to determine petitioner's likelihood of rehabilitation in the program.[13] These contentions clearly deal with an aspect of the *execution* of the NARA sentence and as such are not properly raised in a § 2255 proceeding. Similarly, the balance of petitioner's claims deal with execution.[14]

Petitioner refers the Court to United States ex rel. Campbell v. Pate, 401 F.2d 55 (7th Cir. 1968) for the proposition that an administrative decision, depriving an inmate of the opportunity to appear before the parole board or possibly persuade it to grant him parole, could not be made in a capricious or unreliable manner. However, that reasoning is inapposite to the facts in the present action as it has been consistently held that § 2255 is not available to question the action *vel non* of the Board of Parole or the Bureau of Prisons regarding the manner in which the prison sentence has been or was being executed, Allen v. United States, 327 F.2d 58 (5th Cir. 1964), United States v. Marchese, 341 F.2d 782 (9th Cir. 1965), cert. denied, 382 U.S. 817, 86 S.Ct. 41, 15 L.Ed.2d 64 (1965), and may not be used to challenge the validity of incarceration without parole since this is a challenge to the execution rather than the imposition of the sentence, habeas corpus being the proper remedy. Halprin v. United States, 295 F.2d 458 (9th Cir. 1961). Neither does the claim of excessive disciplinary treatment at a federal institution (such as Alcatraz) present a ground for relief under § 2255. Sanders v. United States, 183 F.2d 748 (4th Cir. 1950), cert. denied, 340 U.S. 921, 71 S. Ct. 352, 95 L.Ed. 665 (1951).

---

13. Petitioner's original examination for determination of likelihood of rehabilitation at Danbury is not now attacked.

14. Petitioner also alleges that "the Attorney General failed to make any alternative treatment available to him for more than a year and a half" after he left the Daytop Program. (Petitioner's Memorandum, p. 2, filed Dec. 7, 1972). This contention, like the others, obviously goes to the manner in which the sentence is being executed.

Petitioner stresses the fact that the NARA treatment staff at Danbury "never conducted a treatment evaluation . . . or determined whether he is likely to be rehabilitated through the Daytop Program." (Petitioner's Memorandum, p. 1 filed Nov. 20, 1972). While it is true, as petitioner argues, that no one may be sentenced under Title II of NARA until a thirty day study has been made to determine that the defendant is likely to be rehabilitated through treatment, it does not follow that a study is required of each inmate whenever a new program is initiated. In the first place, a study was initially made in accordance with 18 U.S.C. § 4253 and petitioner was sentenced accordingly. Petitioner would have the Court construe that section to require a *new* study every time an inmate expresses dissatisfaction with a NARA program. No such procedure is required by the statute. Second, assuming *arguendo* that NARA officials have acted in such a manner that petitioner is *now* unlikely to be rehabilitated, such action by those officials obviously goes to the question of proper execution of the sentence and is not cognizable in a § 2255 motion.

Petitioner urges this Court to resentence him on the ground that this is the most convenient forum. It is indeed correct that § 2255 was designed to provide a more convenient forum where the records of the case are more readily available. Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969). However, this "convenience" rationale has no application except in an attack upon the *judgment*. In that case the sentencing court is clearly the most convenient forum because of the location of trial transcripts, presentence reports, witnesses, etc. In the instant case, however, not unlike an attack on the conditions of incarceration, the most convenient forum is obviously the district of confinement for it is there that the habeas corpus court will most likely find the evidence (records, prison officials, etc.) to support or refute the allegation of illegal detention. For example, if fifty-one inmates at Danbury, one from each state and the District of Columbia, were to contest the Daytop Program as petitioner has done, it becomes clear that the sentencing courts are not the most convenient forums. Officials at Danbury would be overwhelmed if required to testify at even one-half of the oral hearings in such a case.

In sum, the clear intention of § 2255 would be frustrated if such motions were allowed. The Court therefore holds that the motion is not appropriate, the proper procedure being a writ of habeas corpus in the District of Connecticut.

### The Daytop Program at Danbury

Notwithstanding the fact that habeas corpus, rather than § 2255 is the appropriate vehicle for relief in this case, the Court, having taken testimony in the matter, turns now to a discussion on the merits so that in the event of a review on the issue of jurisdiction, and the Court of Appeals should hold that this Court does have jurisdiction, the Court of Appeals will have before it the findings of this Court on the merits and can determine whether this Court is correct in denying petitioner's request for relief.

The Federal Correctional Institution at Danbury began accepting inmates pursuant to Title II of NARA in March of 1968. Petitioner entered Danbury shortly thereafter on November 11 of that year. The program in effect at that time consisted of two traditional therapy groups each week conducted by staff counselors and lasting a total of two to three hours per week. Mr. John McCullough, the current Director of the NARA unit at Danbury testified that the early program was not especially demanding and would lead to relatively easy parole. Petitioner's participation did in fact lead to parole and he was released from Danbury on December 16, 1969.

During petitioner's absence, the officials at Danbury decided to abandon the

traditional medical model [15] in favor of a self-help therapeutic community such as the Daytop Program [16] where an attempt is made to encourage the addict to help himself. The Daytop community is set up as a family run entirely by ex-addicts and is segregated completely from the general prison program. It includes a structure of command wherein advancement is based on a system of rewards and punishment; accepted behavior is rewarded while undesirable behavior is punished. Punishment is "usually by public humiliation of varying degrees." [17] One method is known as a "haircut" [18] which petitioner described as "dehumanizing".[19]

It shocks the conscience of the Court to learn that such practices are followed in a federal institution charged with the responsibility of rehabilitating narcotic addicts. It is difficult to imagine, and it has not been demonstrated to the Court, how an inmate with as serious and perplexing a problem as drug addiction is helped by being subjected to verbal abuse and humiliation directed at

him by six or eight inmates, with no professional supervision, while he is forced to remain seated in a chair.[20]

While condemning the so-called "haircut" type of therapy, the Court does not want to be understood to criticize the constructive type of group therapy wherein addicts are encouraged to help themselves.

■ However, regardless of the Court's disapproval of some aspects of the Daytop Program in which the petitioner now refuses to participate, the Court has the firm conviction that petitioner is still in need of treatment. Not only was petitioner convicted of possession of marijuana during his parole period, but he was also tested positive for quinine during the same period. These factors, plus the fact that petitioner was delinquent in his after-care attendance [21] lead the Court to find that petitioner was not ready for parole at that time in that he was still in need of treatment. He has not demonstrated that he is ready for parole at this time.[22] This Court is convinced that if petitioner

15. "The medical model sets up a situation where the patient or addict expects the professional to do something to him to make him better." Rapkin, "The NARA Unit at Danbury," 33 American Journal of Correction No. 2 at 24, 1971.

16. *Id.* at 24.

17. *Id.* at 26.

18. Mr. McCullough testified that a typical "haircut" would be administered by six to eight inmates who would point out to the offender "how stupid" his conduct was. This would be accomplished by "shouting and cursing" which although not encouraged was nevertheless condoned by the NARA Staff.

19. Petitioner testified that "haircuts" were given at the prerogative of the inmate in charge, without NARA supervision, and were even likely to take place in the shower room. He further testified that humiliation had taken such forms as putting a mop on the offender's head or a baby bottle in his mouth.

20. The "haircut" is not the only instance of such humiliation. At a "general meet-

ing" the entire Daytop community is called to session to consider a wrongdoing. At such a meeting, all present (fifty to sixty inmates) may redress the wrongdoer. Although the "general meeting" is not used often, it is used when an inmate is returned to the program and would be used if petitioner re-entered the Daytop community.

21. Parole Officer Fry testified that petitioner missed appointments "frequently". The Court notes the fact that this is often a sign that the parolee has returned to drug use. The positive quinine test is, of course, another indicator.

22. Petitioner testified that he was converted to the Muslim religion 27 months ago while at Danbury and that he believes that following the teachings of Most Honorable Elijah Muhammad has cured him of his drug addiction. While the Court commends petitioner for his strong religious convictions, the Court nevertheless feels that a professional program is still needed.

were resentenced and released on parole, it would not be long after his release before his arrest for another violation of the drug laws. This is so because the Court is convinced that petitioner is still an addict and needs institutional therapy for some time before it would be safe for him to be released, even under strict parole supervision. This Court is a strong believer in the group therapy program which encourages the addict to help himself, and is convinced that a constructive self-help program, without the dehumanizing and demoralizing characteristics of the Daytop activities, would be of substantial assistance to petitioner in helping him to cure his drug habit.

And so the Court finds that petitioner should avail himself of another alternative besides the resentencing which he now seeks. On November 1 of this year a third program was instituted at Danbury in which Daytop "dropouts" may participate and which is "somewhat similar" to the original program in which petitioner successfully participated. Participants will be eligible for parole in approximately twelve months. Mr. McCullough testified that this new program is not an encounter situation such as Daytop, and that while he still believes that Daytop would be the best program for petitioner, this new program would also be beneficial and likely lead to parole. However, petitioner refuses to participate. He states that this "refusal to participate in either the Daytop or the new program has not been capricious, but rather has been grounded on a proper insistence that the government [sic] comply with the *right to treatment under a NARA commitment* before it deprives petitioner of his eligibility for parole." (Emphasis added). (Petitioner's Memorandum, p. 4, filed Dec. 7, 1972). This contention lacks merit for two reasons. First, it as-

sumes that petitioner is to be the sole judge of whether the Government has met its responsibility under NARA commitments, and that petitioner and others sentenced under that Act may pick and choose treatment programs according to their whim and caprice. Obviously the judgment of the qualified administrators at Danbury as to what is and what is not the proper treatment for narcotic addicts sentenced under NARA must be accepted unless it clearly appears that the treatment violates petitioner's rights or is improper such as the use of "haircuts".[23] Petitioner urges the Court to accept his judgment with respect to a program about which he knows nothing and in which he refuses to participate. Second, and more important, is the fact that this refusal to participate can hardly be grounded on an insistence to the *right to treatment under a NARA commitment* when petitioner has categorically stated to this Court that under no circumstances will he participate in *any* NARA program and would opt for serving the remainder of the full ten year term rather than return to a NARA program.

Aside fron the question of whether petitioner is justified in his refusal to participate in that part of the Daytop Program which is not objectionable, the Court finds that petitioner's refusal to participate in the new program, or any other program without attempting it, is not justified. Therefore, the Court having decided that it lacks jurisdiction to vacate or otherwise disturb its original sentence and further that even assuming *arguendo* that the Court has jurisdiction, petitioner's motion should be denied on the merits, it is

Ordered that the present motion be and hereby is dismissed.

---

23. *Cf.* Cates v. Ciccone, 422 F.2d 926 (8th Cir. 1970). "The prisoner cannot be the ultimate judge of what medical treatment is necessary or proper for his care." *Id.* at 928. The fact remains that it is petitioner who has made the determination in the case at bar that proper treatment is not available.

UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF PRISONS
FEDERAL CORRECTIONAL INSTITUTION
Danbury, Connecticut 06813
November 22, 1968

Judge L. Youngdahl
United States District Court
District of Columbia
Washington, D. C.
20001

RE: HARTWELL, Charles E.
NO: 22457–CT(NA) (S)

Dear Judge Youngdahl:

The subject is a 30 year old Negro male who was sentenced on October 25, 1968 for a 30 day period of study pursuant to Title 18 USC, Section 4252, Title II of the Narcotic Addict Rehabilitation Act of 1966, charged with possession of narcotics.

Our staff has found that the defendant is an addict and is likely to be rehabilitated through treatment. If you agree with these findings, we would ask that a commitment order under 18 USC, Section 4253 be entered promptly so that the treatment contemplated by that Section can commence. Further, the six month minimum period of treatment which must precede the earliest parole consideration under Section 4254 cannot commence until commitment under Section 4253 is made.

We are not certain as to whether you believe that this defendant should be returned to court for final disposition under the principle of United States vs. Behrens, 375 U.S. 162 [84 S.Ct. 295, 11 L.Ed.2d 224]. If the defendant had pleaded guilty and had been advised of all the possible consequences of the plea, including a commitment under Title II, and had been given his right to allocution before be was committed, you may conclude that Behrens is inapplicable. The reasoning behind the latter interpretation is that once the court agrees with the staff's conclusion, it lacks discretion as to disposition.

Page 2.
November 22, 1968
Judge L. Youngdahl
RE: HARTWELL, Charles E.
NO: 22457–CT(NA) (S)

In any event, if you wish to have this subject returned to court, please have your Marshal advised as to when he should produce the defendant.

Sincerely,
/s/ Frank F. Kenton,
Warden

DUS:sg

FEDERAL CORRECTIONAL INSTITUTION
DANBURY            CONNECTICUT
November 22, 1968

STAFF EVALUATION

RE: HARTWELL, Charles E.
NO: 22457–CT(NA)(S)

Espeard Hartwell is a 30 year old married Negro male resident of Washington, D.C. committed to this Institution on November 10, 1968 for a 30 day period of study as provided for by the NARA Act of 1966 following his conviction in the United States District Court in Washington, D.C. for the offenses of posession [sic] of narcotic drugs and receipt and concealment of narcotic drugs. He states that when he was approximately 23 years old he began sniffing heroin and did so off and on until approximately 1966. At that time he claims he began the intravenous use of heroin and has done so until the time he was arrested on the instant offense. Physical examination at this Institution revealed that he had "tracks" in both of his arms and both of his legs which is indicative of the intravenous use of narcotics.

The instant offense is his first conviction for a felony. He first experienced difficulty with law enforcement officers

in March of 1963 at which time he was arrested for assault on his wife. He has been arrested on three more occasions for assault on his wife and it is quite clear that their relationship was characterized by a tremendous amount of conflict. He has one other arrest charge for drunk and disorderly conduct for which he paid a $10.00 fine. Although he was arrested for housebreaking in 1964 he states that he was not tried for this offense and was simply questioned. Mr. Hartwell's formative years were characterized by much moving around due to the death of his parents. He was shifted from one relative and or foster home to another over the years and claims that he quit school in the eleventh grade to move out on his own and to take care of himself. He has worked since he was sixteen years old as waiter, cook, construction worker, but admits that he does not have any specific trade. He has terminated the relationship with the former common law wife with whom he had so much difficulty. He is presently legally married and this wife is expecting their child in approximately January of 1969.

Physical examination at this Institution revealed that Mr. Hartwell was in good physical health and had no limitations on his ability to work. He is not considered psychotic and is therefore free from any major mental illness. He does not appear to be a delinquently oriented individual, and explains his narcotics addiction in terms of his inability to cope with the severe stress put on him as the result of the conflict between him and his former common law wife. He has had a reasonably stable work history and expresses a desire to learn a trade at this Institution, better himself academically, and gain an understanding of why he did in fact become involved with narcotics. He appears to be sincerely motivated in these areas.

The Narcotic Addict Treatment Unit at Danbury, Connecticut considers that Mr. Hartwell is a narcotic addict within the meaning of the law. The Treatment Unit further feels that in view of his positive motivation, his lack of significant prior record of delinquency, and his positive outlook toward his future, that he is treatable at this Institution.

/s/
Donald U. Stein, M.D.
Director
Narcotic Addict Rehabilitation Unit
DCB:sg